UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JESSICA LANGFORD,                          )
                                           )
                Plaintiff,                 )
                                           )
        v.                                 )        No. 4:18CV2037 HEA
                                           )
CITY OF ST. LOUIS, MISSOURI,               )
                                           )
                Defendant.                 )

**<u>OPINION, MEMORANDUM AND ORDER</u>**

This matter, filed pursuant to 42 U.S.C. § 1983, is before the Court on fully briefed cross-motions for summary judgment filed by plaintiff Jessica Langford and defendant the City of St. Louis, Missouri (the "City").

In 2012, the City enacted a municipal ordinance entitled "Impeding and interfering with pedestrian and vehicular traffic," codified in part as Section 17.16.275 of the Revised Code of St. Louis (the "Ordinance"). The Ordinance repealed and replaced a prior City ordinance, Section 17.16.270, that the Eighth Circuit Court of Appeals found to be unconstitutional on its face.[1] On January 21, 2017, plaintiff participated in a public protest known as the "Women's March" in downtown St. Louis. She was arrested for violating the Ordinance. After the charges were dropped plaintiff filed this action seeking injunctive and declaratory relief, nominal and compensatory damages, and attorney fees. The complaint alleges the Ordinance violates plaintiff's free speech rights guaranteed by the First and Fourteenth Amendments of the United States Constitution; is overbroad both as applied to her and facially (Count I); and is void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment (Count II).

---

[1]See <u>Stahl v. City of St. Louis, Mo.</u>, 687 F.3d 1038 (8th Cir. 2012).

For the reasons stated below, the Court concludes the Ordinance is unconstitutional on its face and as applied to plaintiff, and it is void for vagueness.  The Court will grant plaintiff's motion for summary judgment and deny the City's motion for summary judgment.

I.      **Factual Background**

    A.   The Incident

Plaintiff is a citizen and resident of St. Louis County, Missouri and is a parent and teacher.  She had not participated in any marches or protests prior to January 2017.  On January 21, 2017, she participated in the Women's March in St. Louis that took place shortly after the inauguration of President Trump.  Thousands of people assembled for the Women's March on the morning of January 21 near Union Station in downtown St. Louis.  It commenced with a march east on Market Street from approximately 18th Street near Union Station to a rally at Luther Ely Smith Square near the Arch, with marchers occupying all lanes of Market Street.  Various persons gave speeches at the rally.  When the rally concluded most of the thousands of Women's March participants returned west on Market Street back toward the proximity of Union Station, again occupying all traffic lanes.

St. Louis police were aware in advance that the Women's March was being planned and accommodated it by closing Market Street and its cross-streets east of 18th Street. Plaintiff did not observe any cars attempting to drive down Market Street during the March.  After the rally, she along with many other marchers walked back the way she had come, west on Market Street toward her car which was parked close to Union Station.  Throughout the walk back to her car, people were observed in the street. No cars were observed attempting to drive on Market Street.

Shortly before noon Plaintiff was part of a group of people marching west on Market Street near the 16th Street intersection.  Police officers instructed the marchers to move to the sidewalk but initially they did not comply.  St. Louis bicycle officers then approached the group

in the street that included plaintiff and directed them to move to the sidewalk.  The parties disagree about whether the officers' command was directed specifically to Plaintiff or to the group in general.  Because it does not affect the outcome, the Court will assume that the command was directed specifically to Plaintiff.

Some people near Plaintiff were shouting at the police officers but she was not shouting. Plaintiff moved close to the sidewalk, which was crowded with people, but did not step onto it. Plaintiff remained in the curb lane of Market Street where cars would normally park, as opposed to drive, if there had been any cars parked at the time.  Plaintiff did not obey the police officers' command to get out of the curb lane of the street in part because she wanted to have a conversation with one of the officers next to her about how the police were being perceived by members of the community, because she thought maybe they didn't know, so she said something to Lt. Scott Boyher about comments that had been made by speakers at the Women's March rally.  Plaintiff submitted a declaration signed under penalty of perjury stating that at the time, she did not intend to obstruct, impede, interfere, hinder, or delay the reasonable movement of vehicular or pedestrian traffic.  Pl.'s Ex. 4.

When plaintiff did not step onto the sidewalk and instead made her statement about the rally, Lt. Boyher immediately arrested her for violating the Ordinance and failing to obey the order of a police officer.  At the time of plaintiff's arrest, police were attempting to reopen Market Street to traffic.  Plaintiff was in the westbound curb lane of Market Street, near 16th Street, a short distance from the sidewalk.  At the time of plaintiff's arrest, there was no vehicular traffic on Market Street.  Shortly after her arrest, some eastbound traffic began to travel on Market Street.

After plaintiff was arrested, she was handcuffed and taken to a police car that was in the street.  The car was moved to an alley where she was taken out of the car, unhandcuffed, re-

handcuffed and photographed many times by officers, ranging in number between nine and twelve, that were in the alley.  The officers mocked plaintiff and told her to smile although she was crying.  Plaintiff was then booked at the City Justice Center and held for approximately nine hours before she was released.  The charge against plaintiff was prosecuted and was dismissed only when no officer appeared for her scheduled trial.  Plaintiff experienced "a lot of anxiety about what would happen as a result of [her] arrest."  Plaintiff Dep. 25:13-14.

   B. <u>City Policy for Protests</u>

   Special Events Program Executive Ann Chance, a twelve-year City employee, was designated to testify as the City's corporate representative with respect to City policies or practices concerning the issuance of permits for protests.  Ms. Chance testified that the City has "no policies for permits for protests."  Chance Dep. 12:13-17.  She also testified, however, that the Special Events page on the City's website states that permits are required for "Parades; Street, Run and/or Walk; Cycling Race or Ride; and Festival, Street Fairs, Outdoor Concerts; Other large public events," and that the permit process would apply to someone seeking a permit for a protest although protests are not included in the website's list of events.  *Id*. 15:18-16:15.  She testified the appropriate permit application for closing a street for a protest is a parade permit, which would be sent to the City's police, fire, and street departments for approval.  *Id*. 24:19-25:9.

   Numerous protests, demonstrations, and marches have taken place in the City without a permit since 2012, including the 2017 and 2018 Women's Marches.  Chance Dep. 39:5-7; 44:13-45:16, 51:23-59:11.  In fact, only one application has ever been filed with the City for a Special Event permit for a protest, the 2019 Women's March.  Unlike the 2017 and 2018 Women's Marches, the 2019 March added a stage, tents, and vendors to the street march and the City issued it a festival permit.  *Id*. 32:5-33:3.

4

The organizers of the 2017 Women's March communicated with Ms. Chance about the event and asked her about a permit shortly before it took place. *Id*. 41:21-42:17. The organizers agreed to stay on the sidewalk and obey traffic signals, but Ms. Chance realized the event appeared to be growing in size and as a result contacted the police department's Operational Planning department, which reviews and approves permit applications. *Id*. 38:3-24. Ms. Chance told Operational Planning, "It is a First Amendment deal so we generally don't issue permits; but if we have to close the streets, it would require a permit, security, et cetera. Some direction would be great." Chance Dep. 42:19-43:10. Operational Planning responded to Ms. Chance by informing her that the Chief of Police was aware of the Women's March and was "standing by and monitoring all events planned for the day" but had no further response. *Id*. 43:11-18. Ms. Chance then told the Women's March organizers she was "still waiting to hear from [the police] on street closings and a permit," gave them a special event permit application and street application, and other information about traffic control companies, porta-potty companies, and private security. *Id*. 43:19-44:10.

St. Louis Police Lieutenant Timothy Sachs testified that St. Louis streets are occasionally blocked by protest activity, but when people are marching in the street "it's illegal right away" based on "a state statute or the city ordinance violations that indicate that they're in violation of that." (Doc. 26-5 at 11-17.)[2] Lt. Sachs testified the decision whether someone would be arrested for being in the street during a protest is made by the police incident commander at his or her discretion. *Id*. at 18-23. Sergeant Brian Rossomanno testified that while it was not necessary for police to declare an unlawful assembly when protestors are blocking streets, the practice is that

---

[2]The cited testimony of Lt. Sachs and Sgt. Rossomanno is from a preliminary injunction hearing held October 17, 2017 in Ahmad, et al. v. City of St. Louis, Mo., No. 4:17-CV-2455 CDP (E.D. Mo.), submitted by plaintiff in support of her summary judgment motion. The City did not object to the Court's consideration of this testimony and cited other portions of it in support of its own summary judgment arguments.

"we do.  Of the 200 protests I've worked, 90 percent of them, we've allowed them to march in

the streets, and we do nothing but block traffic for them."  (Doc. 26-5 at 213.)  Sgt. Rossomanno

testified that whether someone would be arrested for blocking streets would normally be up to

the incident commander.  *Id*.

C.  The Ordinance

Board Bill 169 CS (Committee Substitute) was adopted by the Board of Aldermen,

engrossed and enrolled, and approved and signed by the Mayor on November 8, 2012.  (Doc. 23-

5.)  The City Register's Office stamped Ordinance Number 69282 on the approved Board Bill

169 CS.  Section Four of Ordinance 69282, titled "Impeding and Interfering with Pedestrian and

Vehicular Traffic," was codified as §17.16.275 of the Revised Code of St. Louis.   Section

§17.16.725 (the "Ordinance") has six subsections.   The first five subsections are substantive

limits on conduct and the sixth is a penalty provision:

> A.     No person, or persons congregating with another or others, shall
> stand or otherwise position himself or herself in any public place in such a manner
> as to obstruct, impede, interfere, hinder or delay the reasonable movement of
> vehicular or pedestrian traffic.
>
> B.     No person, or persons congregating with another or others, shall
> stand or otherwise position himself or herself in any entrance, exit, corridor or
> passage of any public building in such a manner as to obstruct, impede, interfere,
> hinder or delay the reasonable movement of vehicular or pedestrian traffic.
>
> C.     No person, or persons congregating with another or others, shall
> stand or otherwise position himself or herself at the entrance or exit to a private
> building, including driveway, entrance to a garage and entrance to a parking pad,
> in such a manner as to obstruct, impede, interfere, hinder or delay the reasonable
> movement of vehicular or pedestrian traffic.
>
> D.     No person, or persons congregating with another or others, shall
> for the purpose of selling or offering for sale goods or services without a license;
> or soliciting a ride, employment, business, or contributions from vehicular traffic:
>
> > 1.  Stand or otherwise position himself or herself in any public place;
> > 2. Stand or otherwise position himself of herself at the entrance or exit to a
> > private building or public building, including the driveway, entrance/exit
> > to a garage and entrance/exit to a parking pad.

E.      No person who has committed an act or acts within the description of subsections (A) through (D) above, upon being given an order by a police officer, state trooper, marshal, ranger, firefighter, Missouri authorized security guard, or other authorized law enforcement or emergency response personnel to disperse, clear, or otherwise move, shall fail or refuse to obey such order.  Such failure or refusal shall constitute the separate offense of failure to obey a dispersing order by a police officer, state trooper, marshal, ranger, firefighter, Missouri authorized security guard, or other authorized law enforcement or emergency response personnel.

F.      Any person violating any of the provisions of this section shall, for each such violation, be guilty of a Class A misdemeanor and upon conviction shall be subject to a fine of no less than one hundred dollars ($100) and not more than five hundred dollars ($500) or by imprisonment for not more than ninety days, or by both fine and imprisonment.

Section 17.16.725.

Section Three of Ordinance 69282 defines the terms "public place," "public building,"

and "private building or private place" as used in the Ordinance as follows:

1.       **Public Place** means a street; roadway; sidewalk; alley; highway; bridge; overpass; passageway; driveway entrance; entrance or exit to a parking lot or garage; bus stop; park; median; and property (whether public or private) that is immediately adjacent to a street, roadway, sidewalk, alley, highway, bridge, overpass, passageway, driveway entrance, entrance or exit to a parking lot or garage, bus stop, park, or median.

2.      **Public Building** means any structure that has a business license from the City of St. Louis; conducts governmental business on behalf of the United States of America, State of Missouri or City of St. Louis, or other authorized governmental entity; non-profit entity; restaurants, banks, shops, gyms, financial institutions, libraries, museums, hotels and other entities that invite the public as customers, patrons or visitors; place of employment; schools; medical facilities; places of worship; and residential property of more than 4 dwelling units.

3.      **Private Building** or **Private Place** means any residential property or lot of fewer than 5 dwelling units.

St. Louis City Ordinance No. 69282, Board Bill No. 169 CS (Doc. 23-5 at 2).  Section

One of the Ordinance, Findings, recites its purpose in pertinent part:

2.  The residents of, visitors to, business owners of, and taxpayers within the City of St. Louis have an interest in protecting themselves from the health and safety

7

problems associated with having their reasonable movement as pedestrians or while in vehicles obstructed, impeded, interfered, hindered or delayed or being solicited for a ride, employment, business or contributions while in their vehicles.

3.  It has been determined that existing law does not sufficiently address the interest of the public and the health and safety problems associated with interfering with pedestrian and vehicular traffic, because the current law does not clearly define what behavior is proscribed as impeding and interfering with pedestrian and vehicular traffic.

*Id*. (Doc. 23-5 at 1-2).

The parties agree that a single person could be guilty of a violation of the Ordinance by conducting himself in violation of its terms.  The Ordinance applies virtually everywhere a pedestrian might be present in public in the City.

## II.    Legal Standard

The standard applicable to summary judgment motions are well settled.  Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party.  *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.,* 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor).  Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a

8

genuine issue of material fact exists.  Fed. R. Civ. P. 56(c); *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1029 (8th Cir. 2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir. 1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Herring,* 207 F.3d at 1029 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The nonmoving party must cite to specific facts in the record demonstrating a genuine issue of fact for trial and may not rely solely on allegations."  *Lucke v. Solsvig*, 912 F.3d 1084, 1087 (8th Cir. 2019).

Where parties file cross-motions for summary judgment, as here, each summary judgment motion must be evaluated independently to determine whether a genuine dispute of material fact exists and whether the movant is entitled to judgment as a matter of law.  *See, e.g., Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983).  In some instances, "denial of one summary judgment motion leads to the granting of the other because the parties' motions negate each other under the legal principles at work."  *Level 3 Commc'ns, LLC v. City of St. Louis, Mo.*, 540 F.3d 794, 798 (8th Cir. 2008).

## III.   Discussion

The complaint alleges the Ordinance violates plaintiff's free speech rights guaranteed by the First and Fourteenth Amendments of the United States Constitution and is overbroad facially and as applied to her (Count I) and is void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment (Count II).  Plaintiff seeks declaratory and injunctive relief, nominal and compensatory damages, costs, and reasonable attorney fees pursuant to 42 U.S.C. § 1988.

### A.  Facial Challenge - Overbreadth

9

Plaintiff claims the Ordinance is facially unconstitutional because it is substantially overbroad, its effect on protected speech is greater than necessary to advance the City's legitimate interest in traffic regulation, it is not narrowly tailored, and it leaves enforcement to the unfettered discretion of the officer on the scene.

"[T]he distinction between facial and as applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings or disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). "The First Amendment doctrine of overbreadth is an exception to [the] normal rule regarding the standards for facial challenges." *Virginia v. Hicks,* 539 U.S. 113, 118 (2003). "[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). "The aim of facial overbreadth analysis is to eliminate the deterrent or 'chilling' effect an overbroad law may have on those contemplating conduct protected by the First Amendment." *Turchick v. United States*, 561 F.2d 719, 721 (8th Cir. 1977) (footnote omitted).

### 1.  **Level of Scrutiny**

The Court must first determine the level of scrutiny to apply in reviewing plaintiff's facial challenge. To determine what limits, if any, may be placed on protected speech, the analysis begins with the speaker's choice of forum. The standards by which limitations on speech are evaluated vary depending on the forum. *Frisby v. Schultz*, 487 U.S. 474, 479 (1988). Three types of forums exist in First Amendment analysis: traditional public forum, public forum created by government designation, and nonpublic forum. *Id*. at 479-80.

Public streets are traditional public forums.  "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Committee for Indus. Org*., 307 U.S. 496, 515 (1939).  In such traditional public forums "the rights of the state to limit expressive activity are sharply circumscribed."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983).  "In these quintessential public forums, the government may not prohibit all communicative activity."  *Id*.  The government may "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Id*. (citing cases); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *accord Grayned v. City of Rockford*, 408 U.S. 104, 114-16 (1972) (except for the "reasonable regulation" of time, place, and manner of speech, "peaceful demonstrations in public places are protected by the First Amendment").

    2.  **Time, Place, and Manner Analysis**

      a.  Content Neutrality

The first inquiry is whether the Ordinance is content neutral.  "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."  *Ward*, 491 U.S. at 791.  The government's purpose is an important consideration.  "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."  *Id*.

Here, the Ordinance is content neutral, and the parties do not dispute this.   The Ordinance's stated purpose is to protect the interest of the public "from the health and safety problems associated with interfering with pedestrian and vehicular traffic."  (Doc. 23-5 at 1-2.) This justification for the Ordinance has nothing to do with content, and the plain language of its text does not draw any content-based distinctions.   Thus, the Ordinance satisfies the requirement that time, place, or manner restrictions be content neutral.  *See Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 295 (1984).   As a result, intermediate scrutiny is the appropriate standard for examination of the First Amendment issues raised here.  *See Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678, 689 (8th Cir. 2012) (en banc).

b.   Significant Government Interest

It is undisputed the City has significant interests in promoting public health and safety and in ensuring the free flow of vehicular and pedestrian traffic on streets and sidewalks. *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640 650 (1981) ("As a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid government objective.").

c.   Narrowly Tailored

Once the Court has determined the Ordinance is content neutral and serves a significant government interest, the next inquiry under time, place, and manner analysis is whether the Ordinance is narrowly tailored to serve the government interest.  "The tailoring requirement does not simply guard against an impermissible desire to censor.  The government may attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience."  *McCullen v. Coakley,* 573 U.S. 464, 486 (2014).  "Where certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance.  But by demanding a close fit between ends and means, the tailoring requirement

12

prevents the government from too readily sacrificing speech for efficiency." *Id.* (internal quotation marks, brackets, and quoted case omitted).

The Court is mindful that although a "regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests . . . it need not be the least restrictive or least intrusive means of doing so." *Ward*, 491 U.S. at 798. "Rather, the requirement of narrow tailoring is satisfied so long as the [Ordinance] promotes a substantial government interest that would be achieved less effectively absent the regulation" without "burden[ing] substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 799 (internal quotation marks and internal citations omitted).

Whether the Ordinance is "narrowly tailored or not depends on what it seeks to regulate." *Phelps-Roper*, 697 F.3d at 693; *see also United States v. Williams*, 553 U.S. 285, 293 (2008) ("it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."). After determining what the Ordinance regulates, the next inquiry is whether it restricts "substantially more speech than is necessary." *Ward*, 491 U.S. at 798-99.

### i. What the Ordinance Seeks to Regulate

The Ordinance is titled "Impeding and interfering with pedestrian and vehicular traffic" and its text is quoted above. The portions most relevant to this case are subsections (A) and (E), which provide:

> A.     No person, or persons congregating with another or others, shall stand or otherwise position himself or herself in any public place in such a manner as to obstruct, impede, interfere, hinder or delay the reasonable movement of vehicular or pedestrian traffic.
>
> . . . .
> E.     No person who has committed an act or acts within the description of subsections (A) through (D) above, upon being given an order by a police officer, state trooper, marshal, ranger, firefighter, Missouri authorized security guard, or other authorized law enforcement or emergency response personnel to

13

disperse, clear, or otherwise move, shall fail or refuse to obey such order.  Such failure or refusal shall constitute the separate offense of failure to obey a dispersing order by a police officer, state trooper, marshal, ranger, firefighter, Missouri authorized security guard, or other authorized law enforcement or emergency response personnel.

Section 17.16.275(A), (E).

The Ordinance's scope is extremely broad.  It applies at all times and in all public places, which the Ordinance defines as any "street; roadway; sidewalk; alley; highway; bridge; overpass; passageway; driveway entrance; entrance or exit to a parking lot or garage; bus stop; park; median; and property (whether public or private) that is immediately adjacent" to each of the foregoing.  The Ordinance applies to obstructions, hindrances, or delays of any length of time.  It applies to one person standing alone, to two people, or to a group of people of any size assembled; and to impeding or interfering with pedestrian as well as vehicular traffic.

The text of the Ordinance does not contain a *mens rea* requirement, i.e., it does not require that a person *intend* to "obstruct, impede, interfere, hinder or delay the reasonable movement of vehicular or pedestrian traffic."  Thus, the Ordinance permits the arrest of individuals who inadvertently impede or interfere with the movement of vehicles or persons.[3]

The Ordinance as interpreted and implemented by the City does not require that any vehicular or pedestrian traffic actually be impeded or interfered with by the act of the person or persons for a violation to occur.  In this case it is uncontroverted there was no traffic on Market Street when plaintiff was arrested for violating the Ordinance; rather, police wanted to reopen it.  The City asserts this is an appropriate application of the Ordinance and plaintiff was arrested based on probable cause she had committed a violation of the Ordinance.  *See Forsyth Cnty. v.*

_____

[3]For the remainder of this opinion, the Court refers to the series of verbs constituting the conduct prohibited by the Ordinance as "impeding or interfering with" vehicular or pedestrian traffic, and to the various law enforcement and emergency response personnel authorized to issue a dispersal order as "police officers."

14

*Nationalist Movement,* 505 U.S. 123, 131 (1992) ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it.").  Thus, the Ordinance permits the arrest of individuals who are not actually impeding or interfering with the movement of vehicles or pedestrians by police officers who anticipate such impeding or interfering.

The Ordinance contains no exception for expressive activity, including protests, demonstrations, marches, or conversations with government or law enforcement officials.

The Ordinance does not specify any criteria or standards that establish when a violation has occurred, such as the degree or amount of impeding or interfering with traffic, or the kind or type of harm resulting therefrom, to guide or limit police discretion in its enforcement.  As a result, the Ordinance leaves enforcement decisions entirely up to the discretion of police officers.

Subsection (E) of the Ordinance provides that anyone who commits any of the acts listed in subsections (A) through (D) must obey an order to disperse or move given by a police officer. The failure to obey such an order "shall constitute the *separate* offense of failure to obey a dispersing order[.]"  (Emphasis added.)  The text of the Ordinance does not require that the order to disperse or move be lawful or reasonable, and it contains no criteria or specifications as to what may trigger an order to disperse, again leaving enforcement decisions entirely up to the discretion of police officers.  Subsection (E) does not provide any criteria for determining how far a person must move in order to comply with such an order.

On the face of the Ordinance subsections (A) and (E) set out two separate and disjunctive offenses.  Subsection (A) makes it an offense for a "person, or persons congregating with another or others, [to] stand or otherwise position himself or herself in any public place in such a manner as to obstruct, impede, interfere, hinder or delay the reasonable movement of vehicular or pedestrian traffic."  Subsection (E) makes it a separate offense for a person who has committed

15

an act falling within the description of subsection (A) to fail or refuse to obey an order by a police officer to "disperse, clear, or otherwise move."  As previously stated, plaintiff was arrested on both offenses.

Subsection (F) criminalizes any violation of subsections (A) through (D) as constituting a Class A misdemeanor, with penalties of a fine of no less than $100 and no more than $500, or imprisonment for not more than 90 days, or both fine and imprisonment.

### ii. Restriction of Speech

The Court now examines whether the Ordinance as interpreted and applied by the City restricts "substantially more speech than is necessary."  *Ward*, 491 U.S. at 798-99.  As the Supreme Court stated in *Cox v. Louisiana,* "The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time."

> The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy.  The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order.  A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection.

379 U.S. 536, 553-55 (1965) (emphasis added).  "A law insuring public safety and security is not susceptible to abuses of discriminatory application when the behavior it targets is clear and the law enforcement action it authorizes is necessary to its success."  *Bell v. Keating*, 697 F.3d 445, 459 (7th Cir. 2012).

The Ordinance establishes a broad prohibition against impeding and interfering with vehicular and pedestrian traffic and includes no exception for expressive activity.  The Ordinance regulates conduct that has an expressive element because streets, sidewalks, and other public

16

places are quintessential public forums.  The Ordinance regulates persons' abilities to engage in some of the purest and most protected forms of speech and expression.  A wide range of First Amendment activities traditionally occurs on streets, sidewalks, and other public places, some planned and some extemporaneous.  Marches, protests, demonstrations, and other gatherings concerning political and labor issues, among others, historically have taken place on St. Louis's public streets and sidewalks.  The City's corporate representative testified that numerous protests and marches have occurred on St. Louis streets since the Ordinance was enacted.  All of these First Amendment activities were subject to the restrictions set forth in the Ordinance because they took place on public streets.[4]

Based on its text and the City's interpretation of its application, the Ordinance is an "extremely broad prohibitory law," *Cox*, 379 U.S. at 558, that authorizes any police officer to put an end to expressive conduct on a street or sidewalk at any time for any reason, whether he dislikes a speaker's message or simply wants her to hurry up.  The Ordinance does not specify any objective criteria or standards for a police officer to determine whether a person is impeding or interfering with vehicular or pedestrian traffic, nor does it require that actual impeding or interfering occur for a violation to be found.  Thus, under the Ordinance, persons may exercise their First Amendment rights in the City's streets, sidewalks, and other public places only at the "whim of any police officer."  *See Shuttlesworth v. City of Birmingham,* 382 U.S. 87, 90 (1965).  Such a situation "does not provide for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat."  *Id.* (quoting *Cox*, 379 U.S. at 579 (separate opinion of Black, J.)).

---

[4]The City filed a supplemental exhibit to its summary judgment motion, City Ex. 6A, listing the names of all persons arrested pursuant to the Ordinance and their dates of arrest.  Plaintiff contends that many of the arrests correspond to the dates of public protests.  The Court makes no factual finding in this respect.

An example of how the Ordinance burdens more speech than is necessary to further the City's legitimate interests, pointed out by plaintiff is that it applies to streets with little or no vehicular traffic and sidewalks where no one is trying to get by. *See Frisby*, 487 U.S. at 485 ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy."); *McCullen*, 573 U.S. at 494 (holding that sidewalk buffer zone around abortion clinics burdened more speech than necessary where the state "ha[d] available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate"). The Ordinance is also not narrowly tailored because it applies to a single person or a small handful of people in any context and at any time. Thus, it applies to and would allow punishment of two neighbors who stand and converse in a residential street, or to persons gathering for a neighborhood block party. It applies to a single person or group of persons standing on a sidewalk waiting for an Uber to arrive. It applies to any spontaneous gathering of persons on sidewalks or in the streets in response to a dramatic political or news event, or a concert or sporting event. It applies to members of a group of sightseers, sports fans, tourists, or school children who might innocently gather and assemble on a public street or sidewalk in such a manner as to impede or interfere with traffic.

Because the text of the Ordinance is so broad, it is undoubtedly violated every day by ordinary activities that could subject persons to arrest for its violation, within the complete discretion of police officers. Without any standards to tie the Ordinance's application to conduct that realistically presents public health, safety, or traffic concerns, beyond those presented on a daily basis by ordinary use of the streets and sidewalks, the Ordinance is not narrowly tailored and "allows an unrestricted delegation of power which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory, and overzealous enforcement." *Bell*, 697 F.3d at 463 (internal punctuation and quoted cases omitted). *See also*

18

*Josephine Havlak Photographer, Inc. v. Village of Twin Oaks*, 864 F.3d 905, 919 (8th Cir. 2017) ("A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'") (quoting *Forsyth Cnty.*, 505 U.S. at 130);  *cf. Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1039 (9th Cir. 2006) (city's administrative interpretation of ordinance requiring permit for community events taking place on streets was not narrowly tailored where it lacked any provision tailoring its application to events that presented serious traffic and safety concerns beyond those presented by ordinary use of streets and sidewalks).

The Ordinance's ban on all conduct that impedes or interferes with vehicular or pedestrian traffic on any street or sidewalk—which includes not only expressive activities such as parades, protests, rallies, and marches, but also as in this case an individual pausing to address a grievance to a police officer—without requiring an intent to impede or interfere, and without requiring actual impeding or interfering, restricts more speech than is essential to further the City's interests in public health and safety and traffic regulation.  *See Ward*, 491 U.S. at 799 (holding that, to be "no more restrictive than necessary," a law may not "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals").

The Ordinance imposes "serious burdens" on constitutionally protected speech of third parties not before the Court and suppresses considerably more speech than is necessary to serve the City's significant interests.  *See McCullen*, 573 U.S. at 487.  The City's legitimate interest in public safety and health and traffic regulation is simply insufficient to justify such a ban.  *See id.* (striking down law that "carve[d] out a significant portion" of sidewalks adjacent to an abortion clinic for speech ban because law was not narrowly tailored to government's interests in, among

other things, "promoting the free flow of traffic on streets and sidewalks"). *See also Johnson v. Minn. Park & Rec. Bd.*, 729 F.3d 1094, 1099 (8th Cir. 2013) (affirming preliminary injunction against content-neutral regulation that restricted literature distribution in a public park during a Pride Festival to booths, and thus banned plaintiff from distributing Bibles in certain areas of fairground, as not narrowly tailored; holding it was "not enough for the [park] Board to recite an interest that is significant in the abstract; there must be a genuine nexus between the regulation and the interest it seeks to serve"); *Phelps-Roper v. Koster*, 713 F.3d 942, 952-53 (8th Cir. 2013) (holding that funeral protest statute was content-neutral and subject to intermediate scrutiny but had "impermissibly broad reach" because it "ha[d] the effect of creating buffer zones in which picketing and protest activities [we]re prohibited and which float through the city").

The Court concludes the Ordinance burdens substantially more speech than is necessary to achieve the City's significant interests in public health, safety, and traffic regulation.  Thus, it fails to comply with the requirement that it be narrowly tailored to serve a significant governmental interest. *Ward*, 491 U.S. at 791.

### *iii.  Limiting Construction on the Ordinance*

The Court now considers whether a limiting construction is properly placed on the Ordinance.  "In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered." *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494 (1982).  In assessing "whether the enactment reaches a substantial amount of constitutionally protected conduct" the Court considers "the actual text of the [Ordinance] as well as any limiting constructions that have been developed." Boos v. Barry, 485 U.S. 312, 329 (1988).

The City's primary defense to plaintiff's facial overbreadth challenge is that the Ordinance prohibits only knowing or intentional conduct.  It argues that the Missouri Court of

Appeals has held the Ordinance is subject to the "usual *scienter* requirements defined by Missouri criminal law," citing *City of St. Louis v. Jones,* 536 S.W.3d 794 (Mo. Ct. App. 2018), and Section 562.021 of the Missouri Revised Statutes.  (Doc. 34 at 4.)  The City argues the Ordinance "provides *in substance* that persons may not *intentionally* position themselves in rights of way or other locations to obstruct, impede or delay the reasonable movement of vehicular or pedestrian traffic."  (Doc. 23 at 2-3) (emphasis added).  The Court cannot agree.

### (A)   Statutory Limitation

The Court concludes that Section 562.021.3 of the Missouri Revised Statutes does not impute a *mens rea* requirement into the Ordinance.  Section 562.021.3 provides that "a culpable mental state" will be required for prosecution of an offense even if the description of that offense does not say so expressly.  The statute, however, does not apply to municipal ordinances.

Section 562.021 is part of Missouri's Revised Criminal Code, which comprises Chapters 556 to 580.  *See* Mo. Rev. Stat. § 556.011 (setting out the Code's title and scope).  Chapter 556 of the Revised Criminal Code is titled "Preliminary Provisions (Criminal Code)."  Section 556.026 provides that "[n]o conduct constitutes an offense or infraction unless made so by *this code* or by other applicable *statute*."  § 556.026 (emphasis added).  The Comment to the 1973 Proposed Code explains that § 556.026 "requires all offenses to be declared by statute and has the effect of abolishing common law crimes which have not been specifically adopted by statute."  Accordingly, where the Missouri Revised Criminal Code uses the words "offense or infraction" it refers to conduct defined as criminal by statute.  *See Cosby v. Treasurer of State,* 579 S.W.3d 202, 207 (Mo. 2019) (en banc) (holding that "[w]hen the legislature provides a statutory definition, it supersedes the commonly accepted dictionary or judicial definition and is binding on the courts.") (internal quotation marks and quoted case omitted); *Stiers v. Director of Revenue*, 477 S.W.3d 611, 615 (Mo. 2016) (en banc) (the "primary rule of statutory

interpretation is to give effect to legislative intent in the plain language of the statute at issue."); *State v. Moore,* 303 S.W.3d 515, 520 (Mo. 2010) (en banc) ("When interpreting a statute, [courts] must give meaning to every word or phrase of the legislative enactment."); *Lane v. Lensmeyer*, 158 S.W.3d 218, 226 (Mo. 2005) (en banc) ("In determining legislative intent, the statute is read as a whole and *in pari materia* with related sections.").

The City relies upon Section 562.021.3 to impute a *mens rea* requirement into the Ordinance.  (Doc. 23 at 3.)  This subsection of the statute provides:

> if the definition of any *offense* does not expressly prescribe a culpable mental state for any elements of the *offense*, a culpable mental state is nonetheless required and is established if a person acts purposely or knowingly; but reckless or criminally negligent acts do not establish such culpable mental state.

§ 562.021.3 (emphases added).  Section 562.021.3 explains what culpable mental state must be shown to prosecute an "offense," which Section 556.026 defines for purposes of the Missouri Revised Criminal Code as conduct made criminal by a state statute.  As a result, Section 562.021 has no bearing on the interpretation of municipal ordinances.  *See State v. Self*, 155 S.W.3d 756, 762 (Mo. 2005) (en banc) ("[I]t is well-settled that, where a specific mental state is not prescribed *in a statute*, 'a culpable mental state is nonetheless required and is established if a person acts purposely or knowingly[.]'" (emphasis added; quoting § 562.021.3)).  Therefore, Section 562.021 does not apply to the Ordinance.

(B)   <u>Case Law Limitation</u>

The City also points to *Jones*, 536 S.W.3d 794, where the Missouri Court of Appeals applied Section 562.021.3 to impute a mental-state requirement into a different City ordinance than is at issue in this case.  Unlike cases where a federal court could rely on a state court's authoritative ruling to give a narrowing construction to an ordinance, *see, e.g., Shuttlesworth, 382 U.S. at 91-92, Agnew v. Government of the District of Columbia,* 920 F.3d 49, 52-53 (D.C. Cir. 2019), the Missouri Court of Appeals decision in *Jones* is not an authoritative ruling that narrows the Ordinance by imputing a *mens rea* requirement into it.  Although the imputed-scienter provision has been a part of the Missouri criminal code for more than 40 years and state courts routinely review the sufficiency of evidence supporting municipal convictions,[5] *Jones* and the per curiam decision it cites, *City of Bowling Green v. Pilliard*, 751 S.W.2d 413 (Mo. Ct. App. 1988), appear to stand alone in applying Section 562.021 to impute a *mens rea* requirement into a municipal ordinance.

The Court believes the Missouri Supreme Court would decide this issue differently.  As discussed above, Section 562.021 does not apply to municipal ordinances, so reliance upon the statute to impute a *mens rea* requirement into the Ordinance is unfounded.  In *Pilliard*, the Missouri Court of Appeals held that a culpable mental state was an essential element of a city ordinance that prohibited driving a motor vehicle with a suspended license, though the ordinance was silent as to a culpable mental state.  751 S.W.2d at 414.  The court discussed a prior court of appeals decision, *State v. Horst,* 729 S.W.2d 30 (Mo. Ct. App. 1987), which held a culpable mental state was an essential element of an offense under a *state statute* that prohibited driving while a license was suspended but was silent as to a culpable mental state, because such a mental state was imputed to the state statute by Section 562.021.2.  *Id.* at 414.  Relying on *Horst*, the

---

[5]Section 562.021 was effective January 1, 1979.  1977 Mo. Laws, S.B. No. 60, p. 662, § 1.

*Pilliard* court summarily concluded "the same rule that applies to a violation of [the state statute] also applies to a violation of the City . . . ordinance," *id.*, without considering the scope of Section 562.021. The court in *Pilliard* thus extended the holding of *Horst* in an unwarranted manner and misapplied the statute. [6]

As previously stated, *Jones* cites *Pilliard* and Section 562.021 in support of its holding. For the reasons just discussed, *Pilliard* does not support the application of Section 562.021 to a municipal ordinance. The *Jones* court relied summarily on *Pilliard's* holding, failed to consider the definition of "offense" as used in the context of Section 562.021, and applied the statute to the ordinance at issue without perceiving the proper limit on the statute's scope.

*Jones* also appears contrary to Missouri Supreme Court precedent. After applying Section 562.021 to the ordinance, the *Jones* court distinguished *Kansas City v. LaRose*, 524 S.W.2d 112 (Mo. 1975) (en banc) (holding a municipal resisting arrest ordinance did not require a culpable mental state), on the basis that *LaRose* predated Section 562.021. *Jones*, 536 S.W.3d 798, n.2. Because Section 562.021 does not apply to municipal ordinances, this was not a valid basis to distinguish *LaRose*. *LaRose* does not address the precise issue presented here, but it recognizes a municipality in Missouri may have an ordinance that does not contain a *mens rea* requirement.[7]

---

[6]As a result of the Missouri Court of Appeals' ruling, the defendant was entitled to a new trial because the verdict directing instruction "did not properly instruct the jury on the requisite mental state of defendant, an essential element of the offense." *Pilliard*, 751 S.W.2d at 414.

[7]The *Jones* court's interpretation of *LaRose* also cannot be readily squared with its prior holding in a case that found *LaRose* controlling after Section 562.021 was enacted. In *St. Louis County v. McDonald,* 804 S.W.2d 759 (Mo. Ct. App. 1990), the defendant argued the county trespass ordinance under which she was convicted was invalid for lacking a *mens rea* requirement, where the state trespass statute required knowing conduct. The court rejected this argument, citing *LaRose* and authorities it quoted therein. *Id.* at 762. The court of appeals thus recognized that *LaRose* remains good law in Missouri following the enactment of Section 562.021, and implicitly recognized that the statute does not operate to import a *mens rea* requirement into municipal ordinances.

24

Finally, in both *Jones* and *Pilliard*, the state court was considering whether the prosecution had proved enough for a conviction, not whether the ordinance at issue was constitutional or gave fair notice of the conduct proscribed.  Indeed, in *Jones*, the criminal defendant had waived any argument relating to "the [trial] court's application of the incorrect mental state."  *Id.* at 801, n.3.  In both cases the effect of the state court's decision applying Section 562.021 to a municipal ordinance was to protect a defendant from conviction without proof of a culpable mental state.  In contrast, here the City's attempt to impute a *mens rea* requirement into the Ordinance by means of Section 562.021 seeks to transform a statute meant to shield individuals from state prosecution of unintentional conduct into a sword to be wielded by the City, against an individual complaining of municipal prosecution of unintentional conduct in the First Amendment context. [8]  For these reasons, the Court determines *Jones* and *Pilliard* are not authoritative rulings giving an explicit narrowing construction to the Ordinance, as there is evidence Missouri law is otherwise.

Since the Ordinance does not include a *mens rea* requirement and there is no appropriate limiting construction provided by state law, the Court concludes the Ordinance does not have a *mens rea* requirement.

(C)   Enforcement Limitation

Finally, the City points to its "policy to refrain from enforcing [the Ordinance] to preclude street protests" as a limiting construction.  (Doc. 34 at 3.)  It asserts there is no evidence in the record that any street protest activity has been prevented by City officials, and that the

---

[8]As for the City's argument it is bound by *Jones*, the police in the present case were without guidance from any state appellate court as to the alleged presence of an imputed *mens rea* requirement in the Ordinance, as plaintiff was arrested in January 2017 and *Jones* was decided in January 2018.  The testimony of Lt. Sachs and Sgt. Rossomanno also undercuts any argument the Ordinance contains a *mens rea* requirement, as they testified that *any* protest in the street is illegal and *anyone* protesting in the street can be arrested in the discretion of the on-scene incident commander, even if most of the time people are allowed to protest in the streets.

Women's March at issue in this case "is a prime example of how the City treats 'expressive activity' on its streets: it allows such activity—unless violence or other circumstances warrant a directive to disperse." (Doc. 34 at 2.)  The City states it "acquiesces in street protests, whether or not anyone asks, requiring no permits under its permitting ordinances nor any advance permission by law enforcement or anybody else." (Doc. 34 at 6.)

A limiting construction of the Ordinance is "distinct from a policy of limited enforcement or prosecutorial discretion." *Clary v. City of Cape Girardeau, Mo.*, 165 F.Supp.3d 808, 817 (E.D. Mo. 2016).  "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010).  A court cannot "uphold an unconstitutional statute merely because the Government promise[s] to use it responsibly." *Id.* The City's claimed policy of self-restraint does not constitute a limiting construction on the Ordinance because it delegates standardless discretionary power to the police at the scene of any protest, thus "resulting in virtually unreviewable prior restraints on First Amendment rights." *Broadrick*, 413 U.S. at 613.  Further, the City's assertion that it acquiesces in street protests is accurate only to the extent and as long as a police officer chooses to acquiesce therein, as demonstrated by the testimony of its police officers and by plaintiff's arrest in this case.

### d.  Ample alternative channels for expression

The final inquiry under the time, place, and manner analysis is whether the Ordinance leaves open "ample alternative channels of communication." *Frisby*, 487 U.S. at 481.  This inquiry is closely related to the question whether it is narrowly tailored. *Phelps-Roper,* 697 F.3d at 695.  The Court has concluded the Ordinance is not narrowly tailored, *supra* at 20, and the City fails to show that the restrictions the Ordinance imposes leave open ample alternative channels for expression.  Streets and sidewalks are traditional public forums not simply because

of being labeled as such by courts, but because they provide ordinary citizens a forum in which to communicate their ideas, beliefs, and opinions to the public at large.  The Ordinance very broadly prohibits all activities that might impede or interfere with pedestrian or vehicular traffic on City streets, sidewalks, and other public areas at any time, for any reason, and by any number of people, and thus it prohibits a substantial amount of protected speech in traditional public forums.

There is no evidence of a mechanism for persons who wish to engage in constitutionally protected expression on a City street or sidewalk to avoid enforcement of the Ordinance, which leaves them vulnerable to standardless police enforcement activity.  As previously stated, the city's alleged self-restraint in enforcing the Ordinance is insufficient as it leaves persons "at the mercy of *noblesse oblige*."  *Stevens*, 559 U.S. at 480.

The City "emphasiz[es] that this is not a case involving permits" (Doc. 23 at 6 n.1) but points out it offers a privilege of access to its streets via a parade permit if a protestor meets certain content-neutral conditions required by its police, fire, and street departments.[9]  This does not constitute an ample alternative channel for expression.  The delay necessarily caused by complying with the City's permit procedures means that spontaneous expression is prohibited by the Ordinance.  Restrictions placed on spontaneous political expression impose severe burdens on political speech.  As the Supreme Court has observed, "timing is of the essence in politics . . . and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all."  *Shuttlesworth*, 394 U.S. at 163 (Harlan, J., concurring).  Further, the record shows that in practice the City does not apply its permit scheme to First Amendment activity, as

---

[9]*See* Chance Dep. 24:19-25:9; City's Reply (Doc. 40 at 3).  *See also* City's Mem. Opp'n Mot. Summ. J. (Doc. 34 at 5) ("The City responded to permit inquiries by representing that no permit was required for the Women's March, but the City made no affirmative representations that marching in the streets was lawful.").  This vague representation encapsulates the uncertain and amorphous framework the Ordinance establishes for the exercise of First Amendment rights in the City.

testified to by its corporate representative and as demonstrated by its Chief of Police's decision to "stand by and monitor" the 2017 Women's March. Thus, the Court finds the Ordinance does not offer ample alternative channels for communication.

In conclusion, the Ordinance is not narrowly tailored to serve the significant and content-neutral government interests of public health, safety, and traffic regulation, and it fails to leave open ample alternative channels of communication. Accordingly, the Court concludes as a matter of law that the Ordinance is not a permissible time, place, or manner restriction under the *Ward* test and is unconstitutional on its face under the First Amendment.

B.   As-Applied Challenge

Plaintiff also contends the Ordinance is unconstitutional as applied to her. "An as-applied challenge consists of a challenge to the statute's application only as-applied to the party before the court." *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004). To prevail, plaintiff "must show that the [Ordinance] is unconstitutional 'because of the way it was applied to the particular facts of [her] case.'" *Phelps-Roper v. Ricketts*, 867 F.3d 883, 896 (8th Cir. 2017) (quoting *United States v. Salerno*, 481 U.S. 739, 745 n.3 (1987)).

As a threshold matter, the City asserts that plaintiff lacks standing to challenge the Ordinance as applied to her because there is no evidence she has been "genuinely threatened with any form of future enforcement action" and she has not presented any evidence she "intends to violate the ordinance in the future by intentionally impeding traffic in the City." (Doc. 23 at 6.) Plaintiff was arrested for violating the Ordinance and asserts she has refrained from engaging in further expressive activity in the City for fear of being arrested under the Ordinance. Plaintiff therefore has standing to pursue an as-applied challenge to the Ordinance. *Duhe v. City of Little Rock, Ark.*, 902 F.3d 858, 863 (8th Cir. 2019) (plaintiffs had standing to challenge disorderly

28

conduct statute where they were arrested for violating it and claimed their First Amendment rights were chilled by the possibility they would be arrested again).

Plaintiff contends the Ordinance is unconstitutional as applied to her because she was arrested and prosecuted for impeding traffic even though (1) she did not intend to impede traffic; (2) there was no traffic to impede; and (3) she was less than 2 feet from the sidewalk, between the parking lane and the curb, and therefore would not have been impeding traffic had there been any on the street.  The uncontroverted facts are that on January 21, 2017, plaintiff participated in the Women's March in St. Louis.  Market Street was obstructed by marchers for several hours, and there was no vehicular traffic traveling—or attempting to travel—on Market Street throughout that time.  As plaintiff was walking west on Market Street after the Women's March speakers had concluded, returning to her vehicle, she heard commands from a police officer to get on the sidewalk.  She moved close to the sidewalk into the parking/curb lane but did not immediately obey the police officer's command and instead stopped to speak to him.  She was immediately arrested under the Ordinance both for impeding and interfering with traffic and refusing to obey a dispersal order.

Subsection (A) of the Ordinance requires that a person "position himself or herself in any public place in such a manner as to obstruct, impede, interfere, hinder or delay the reasonable movement of vehicular or pedestrian traffic."  Section 17.16.275(A).  The City contends the Ordinance was properly applied to plaintiff's arrest and there was "probable cause" she was violating the Ordinance based on the arresting officer's desire to reopen the street and his belief plaintiff would impede traffic if the street were opened.

The Court does not agree.  The Court assumes for purposes of this opinion that the parking/curb lane of Market Street is a street within the meaning of the Ordinance.  That said, plaintiff's conduct did not violate Subsection (A) of the Ordinance because at the time she was

arrested, it is undisputed there was no vehicular traffic on Market Street. Plaintiff could not impede or interfere with traffic when there was no traffic present. Further, because plaintiff's conduct did not violate Subsection (A) of the Ordinance, she could not lawfully be arrested for failing to comply with the police officer's dispersal order. *See Morales*, 527 U.S. at 62.

Because the Ordinance has the effect of circumscribing protected expression and authorized plaintiff's arrest without putting her on fair notice that her conduct was proscribed, the Court concludes the Ordinance is unconstitutional as applied to plaintiff.[10]

C. Facial Challenge–Void for Vagueness

As a second ground for facial invalidation of the Ordinance, plaintiff contends it is void for vagueness in violation of the Due Process Clause for two reasons: (1) it fails to provide fair notice of what conduct is prohibited because it applies to conduct that does not actually impede traffic; and (2) its text makes it susceptible to arbitrary, selective enforcement. The Court will address this ground as an alternative basis for its decision.

"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (cited cases omitted).

A "more stringent vagueness test" applies when a law implicates First Amendment rights. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010). This is because "[s]peech is an activity particularly susceptible to being chilled, and regulations that do not provide citizens with fair notice of what constitutes a violation disproportionately hurt those who espouse unpopular or

---

[10]Because the Court concludes the Ordinance does not have a *mens rea* requirement, it need not address plaintiff's assertion that she had no intent to violate the Ordinance. The Court does not address the City's argument that plaintiff *could* have been arrested for violating state statutes. Plaintiff is not asserting a § 1983 First Amendment retaliation claim in which she would be required to prove the absence of all probable cause. *See Nieves v. Bartlett*, 139 S. Ct. 1715 (2019). Instead, plaintiff challenges the constitutionality of the Ordinance that authorized her arrest.

controversial beliefs." *Stahl v. City of St. Louis, Mo.*, 687 F.3d 1038, 1041 (8th Cir. 2012). "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned,* 408 U.S. at 109 (internal quotation marks and citations omitted). Nonetheless, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Holder*, 561 U.S. at 19 (quoting *Williams*, 553 U.S. at 304).

### 1. **The Ordinance Does Not Provide Fair Notice**

Plaintiff contends the Ordinance fails to provide fair notice of what conduct is prohibited because it applies to conduct that does not actually impede or interfere with traffic, which an ordinary person would not know from its text. Plaintiff asserts the Ordinance's fair notice deficiency is compounded because it does not have a *mens rea* requirement.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see Stahl*, 687 F.3d at 1040. The "requirement of clarity in regulation is essential to the protections provided by the Due Process Clause[.]" *Fox Television Stations,* 567 U.S. at 253. "Even when speech is not at issue, the void for vagueness doctrine" requires that "regulated parties should know what is required of them so they may act accordingly[.]" *Id.* (citing *Grayned,* 408 U.S. at 108-09).

Here, the Ordinance criminalizes conduct that impedes or interferes with traffic, but the City interprets and applies the Ordinance to conduct that does not actually impede or interfere with traffic. Plaintiff was arrested for impeding or interfering with traffic as prohibited by the Ordinance while she was standing in a parking lane near the curb of a street that had no traffic on it. The Ordinance as interpreted and applied by the City failed to provide plaintiff with fair notice that her conduct was in violation of the law. It is not "clear what the ordinance as a whole

prohibits" or that it is "surely valid in the vast majority of its intended applications[.]"  *Hill v. Colorado*, 530 U.S. 703, 733 (2000).  Persons of ordinary intelligence are left to guess what conduct is prohibited, and the Ordinance creates the risk of arbitrary application.  The Ordinance is unconstitutionally vague on its face as to the conduct plaintiff is challenging.

Subsection (E) of the Ordinance, which makes it a separate offense for a person to disobey a law enforcement order to disperse, clear, or otherwise move, does not compel a different result.  Here, subsection (E) may be invoked only against a "person who has committed an act or acts within the description of" Subsection (A).  Plaintiff did not commit an act within the description of Subsection (A) because she did not impede or interfere with traffic. "[V]agueness of a conduct prohibition cannot be cured by the intentionality of a person's refusal to cease that conduct once instructed to do so:  If the statute failed to define what it barred, a move-on order would be no more than an exercise of the officer's unguided discretion."  *Agnew*, 920 F.3d at 60.  "A person's knowing failure to obey such an order could do nothing either to cure the officer's lawless discretion or to establish the individual's culpability."  *Id*.

The Ordinance's due process and fair notice infirmity is compounded by the fact that it contains no *mens rea* requirement.  *See Stahl*, 687 F.3d at 1041 (due process and fair notice defects of earlier version of City's traffic control ordinance were further demonstrated by its lack of a *mens rea* requirement); *see also Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690 (8th Cir. 1992) ("[W]e believe any statute that chills the exercise of First Amendment rights must contain a knowledge element").  The Supreme Court has observed that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."  *Village of Hoffman Estates*, 455 U.S. at 499; see also *Grayned*, 408 U.S. at 113-14 (although question was close, anti-noise ordinance was not impermissibly vague where, among other things, acts must be "willfully done.").

Violation of the Ordinance does not turn on the state of mind of the potential violator but instead on third parties: the law enforcement officers who observe conduct and have unfettered discretion to determine if it constitutes a violation.  *Cf. Stahl*, 687 F.3d at 1041 (violation of City's ordinance hinged on the reaction of third parties, not the state of mind of the potential violator).  This is "especially problematic because of the [O]rdinance's resulting chilling effect on core First Amendment speech."  *Id.*

The Ordinance does not sufficiently define the conduct that it proscribes when measured by common understanding and practices and therefore does not provide fair notice of what conduct it prohibits.  This defect is compounded because the Ordinance lacks a *mens rea* requirement and thus punishes inadvertent conduct.

The City's reliance on *Duhe*, 902 F.3d 858, and *Agnew*, 920 F.3d 49, does not compel a different result as both cases are distinguishable and *Agnew* is not controlling.  In *Duhe*, the Eighth Circuit rejected a vagueness challenge to an Arkansas disorderly conduct statute, distinguishing it from the impermissibly vague City ordinance at issue in *Stahl* "primarily because it contains a *mens rea* requirement specifically defined in . . . the Arkansas Criminal Code."  902 F.3d at 864.  As a result, a conviction under the statute could not be based "solely on the reaction of third parties; the offender must intend to cause public inconvenience, annoyance, or alarm by obstructing traffic or making unreasonable or excessive noise, or must recklessly disregard the risk of doing so."  *Id.*  The *mens rea* requirement "allows potential violators to predict whether a future course of conduct will violate the statute."  *Id.*  Because the statute's *mens rea* requirement was central to the Eighth Circuit's holding in *Duhe* and the Ordinance here does not have a *mens rea* requirement, the *Duhe* decision is readily distinguishable.[11]

___

[11]The City also cites *McCabe v. Parker*, 608 F.3d 1068 (8th Cir. 2010); *Frye v. Kansas City Mo. Police Dep't*, 375 F.3d 785 (8th Cir. 2004); and *Lawyer v. City of Council Bluffs*, 361 F.3d 1099 (8th Cir. 2004).  These cases are inapposite because they concerned challenges to police officers' conduct in

In *Agnew*, the District of Columbia Circuit Court of Appeals rejected a challenge to the District of Columbia's anti-obstructing statute.  In pertinent part the statute makes it "unlawful for a person, alone or in concert with others:" "(1) To crowd, obstruct, or incommode:  (A) The use of any street, avenue, alley, road, highway, or sidewalk;" and "(2) To continue or resume the crowding, obstructing, or incommoding after being instructed by a law enforcement officer to cease the crowding, obstructing, or incommoding."  920 F.3d at 52.  The plaintiffs facially challenged the statute for failing to define what it meant to "crowd, obstruct, or incommode" the use of the specified spaces with enough clarity to prevent arbitrary or discriminatory enforcement.  *Id.* at 55.

There is a fundamental distinction between the present case and *Agnew*:  None of the plaintiffs in *Agnew* were engaged in First Amendment activity when they were arrested for violating the statute.  The D.C. Circuit, therefore,  did not mention the First Amendment, much less apply the appropriate "more stringent vagueness test" in its analysis.  *See Holder,* 561 U.S. at 19.

After a thorough review of the statute's legislative history and prior District of Columbia and federal court rulings interpreting its predecessors, *Id.* at 52-53, the D.C. Circuit construed the statute to "require[] an officer who (1) observes a person crowding, obstructing, or incommoding another's use of a way or passage to (2) direct the obstructor to move on; it authorizes arrest only if the person disobeys the officer's directive."  *Id.* at 53.  The court stated a requirement that an

---

particular situations, not the ordinance under which the police officers acted, and the parties did not bring a constitutional challenge to the ordinances at issue.  *See Stahl*, 687 F.3d at 1040 n.1 (distinguishing *Frye*).  Relatedly, the City's assertion that it cannot be liable under Section 1983 unless there was a constitutional violation by the arresting officer (Doc. 34 at 8-9) is incorrect.  *See*, e.g., *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("[A] municipality may be liable under § 1983 for a single decision by its properly constituted legislative body . . . because even a single decision by such a body unquestionably constitutes an act of official government policy.").

obstructor have a culpable state of mind had been imputed to the statute's predecessors for more

than a century.  *Id*. (citing *Hunter v. District of Columbia*, 47 App. D.C. 406, 409 (1918)).

The court noted the move-on prerequisite was added by the District of Columbia Council

"to prevent[] the arrest of individuals who are not intentionally trying to obstruct the passage of

others and are prepared to alter their conduct when instructed to do so."  *Id*.  The court explained

that the "statute does not criminalize inadvertent conduct, nor does it authorize the police to

direct a person to move on if he is not currently or imminently in the way of anyone else's shared

use of the place at issue."  *Id*. at 52; 58-59.

Although the text of the D.C. statute bears some surface similarity to the Ordinance at

issue here, it is materially different.  The D.C. statute, unlike the Ordinance, does not criminalize

inadvertent conduct.   Nor does it create two separate and disjunctive offenses as does the

Ordinance: impeding or interfering with traffic in Subsection (A), and the refusal to obey an

order to disperse in Subsection (E).   Based on the statute's text, legislative history, and

interpretive prior court decisions, the D.C. Circuit concluded a person can only be arrested under

the following circumstances:

> No one is subject to arrest under the anti-obstructing statute until
> an officer has probable cause to believe that a person has in fact
> "crowd[ed], obstruct[ed] or incommod[ed]" the use of public space
> and "continue[d] or resume[d] the crowding, obstructing, or
> incommoding after being instructed by a law enforcement officer
> to cease."  D.C. Code § 22-1307(a)(2).  Even when an officer
> observes someone "crowd[ing], obstruct[ing], or incommod[ing]"
> and warns him to stop doing so, the person cannot be arrested
> unless he ignores the officer's directive and decides to keep
> obstructing.  The statute thus does not criminally punish those who
> accidentally block the use of a public space.

*Agnew*, 920 F.3d at 58–59.

Because the D.C. Council's avowed objective behind the law was to "give the police the

power to defuse a situation that disturbs the public," the court concluded the "statute does not

35

apply to minor inconveniences or merely subjective annoyance, but only to observed obstacles or blockages." *Id.* at 58. Further, the "statute does not punish conduct that has no effect on other members of the public; it is violated only by actual or imminent obstruction of another person." *Id.* "That is because the provision applies only to crowding, obstructing, and incommoding 'the use of' the specified places by other people. Unless there is someone else who is trying to use the same space and whose use is obstructed, the statute by its own terms is not violated and no 'move on' directive is warranted." *Id.*

This is an important distinction because unlike the D.C. statute, the Ordinance is not limited to observed, intentional obstacles or blockages that actually impede or interfere with "the use of" a public street, sidewalk, or other space by vehicular or pedestrian traffic. As such, the Ordinance authorizes the punishment of inadvertent conduct that has no effect on other members of the public.

Significantly, the D.C. Circuit recognized that the statute's "move-on provision itself gives the officer no guidance for determining whether an order should be made in the first place." 920 F.3d at 59. It cautioned, "If the statutory description of the blockages to which the statute applies were unconstitutionally vague, the move-on provision could not cure—and might well compound—its enforcement-discretion defect." *Id.* at 60. That describes the situation with the City's Ordinance and its dispersal order subsection. Further, the D.C. Circuit concluded that although the statute did not "include any express *mens rea* requirement for the initial obstructing, the move-on provision (when applied to conduct that violates the ban against crowding, obstructing or incommoding) ensures that anyone arrested for failing to move on has at least a reckless state of mind." *Id.* at 61 (emphasis added). The court expanded on this aspect of its reasoning:

> In other words, the statute does not specify that only people who "crowd, obstruct, or incommode" with a certain *mens rea* may be

36

> directed to move on but, because any arrest or other criminal consequence of the anti-obstructing statute can only follow the arrestee's receipt and disobedience of a <u>well-founded</u> "move on" directive, <u>those weightier consequences are necessarily accompanied by some proof of violation with *mens rea*. Indeed, it was for this very purpose that the District of Columbia Council added the move-on provision when it amended the anti-obstructing statute</u>. . . . Rather than requiring proof of a breach of the peace to protect individuals against arrest for inadvertent conduct, the current version of the statute employs the move-on provision to achieve the same goal in a more focused way.

*Agnew*, 920 F.3d at 61 (emphases added).

Consequently, although the D.C. statute does not contain an express *mens rea* requirement, it contains protections against the criminalization of inadvertent conduct that are lacking in the Ordinance. In contrast, subsection (A) of the Ordinance authorizes discretionary arrests for mere inadvertent conduct that impedes or interferes with vehicular or pedestrian traffic, or inadvertent conduct a police officer thinks would impede or interfere with traffic if traffic were present. Subsection (E) establishes the separate offense of failure to obey a police officer's dispersal order but lacks any requirement that the order be well founded. Finally, unlike *Agnew*, there is no legislative history or established body of interpretive case law to provide a narrowing construction of the Ordinance or impute a *mens rea* requirement. In short, the Ordinance does not avoid criminalizing unintentional violations.

After briefing was complete, the City filed a notice of supplemental authority as to *Burbridge v. City of St. Louis, Missouri*, No. 4:17CV2482, __ F.Supp.3d __, 2019 WL 7020183 (E.D. Mo. Dec. 20, 2019), *appeal docketed*, No. 20-1029 (8th Cir. Jan. 6, 2020). In *Burbridge*, the Court held Section 17.16.275 was not facially invalid in violation of 14th Amendment due process principles.[12] <u>Id.</u> at *17. In a brief discussion, the Court stated the Ordinance was

---

[12]The *Burbridge* court's discussion of the standard of review appears to conflate the fair-notice requirement of the Due Process Clause with a facial-overbreadth analysis. 2019 WL 7020183, at *16-17.

amended after its predecessor was invalidated by *Stahl*, 687 F.3d at 1041, quoted the text of Section 17.16.275(A), and summarily concluded it "is clear and provides fair notice as to what conduct is proscribed."  *Id.* at *17.  The *Burbridge* court did not construe the Ordinance or provide any analysis to support its summary conclusion that the text provides fair notice.  Nor did it address the effect of the Ordinance's lack of a *mens rea* requirement, a deficiency discussed by the Eighth Circuit regarding the predecessor ordinance.  *See Stahl*, 687 F.3d at 1041 ("This due process and fair notice infirmity is further demonstrated by the ordinance's lack of a mens rea requirement.").  As a result, it is not persuasive and the Court respectfully declines to follow it.

In addition, *Burbridge* is factually and legally distinguishable.  The plaintiffs challenged the City's unlawful assembly ordinance, Section 15.52.010 of the Revised Code of St. Louis, and Section 17.16.275 solely on due process grounds, not First Amendment grounds.  *See id.* at *16. The *Burbridge* court understood the plaintiffs' as-applied challenge to rest on the City's alleged policy of giving police officers unfettered discretion to declare unlawful assemblies in the absence of force or violence.  2019 WL 7020183, at *17.  The Court stated that assuming there was such a policy the plaintiffs did not show how it caused the two ordinances to be applied unconstitutionally, because police made the decision to declare an unlawful assembly "upon reports that protestors were throwing objects at police officers."  *Id.*  As a result, any City policy allowing police officers unfettered discretion to declare unlawful assemblies "was not the 'moving force' behind the application of the challenged ordinances[.]"  *Id.*  Here, the facts and legal issues are materially different.   Plaintiff does not challenge the unlawful assembly ordinance and there are no allegations of violence prior to or at the time of her arrest.

For the reasons stated above, the Court concludes the Ordinance does not provide fair notice of what conduct it prohibits and it is therefore void for vagueness in violation of the Due Process Clause.

### 2.  **Arbitrary or Discriminatory Enforcement**

Plaintiff also contends the Ordinance's text makes it susceptible to arbitrary, selective enforcement that depends on a third-party's unpredictable assessment: specifically, a police officer's guess as to whether an individual's conduct *would* delay the reasonable movement of pedestrian or vehicular traffic if such traffic were present.

A law may be void for vagueness if it is susceptible to discriminatory or arbitrary enforcement.  *Kolender*, 461 U.S. at 357 (cited cases omitted).  "Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement" the Supreme Court has stated "the more important aspect of vagueness doctrine . . . is the requirement that a legislature establish minimal guidelines to govern law enforcement."  *Id*. at 357-58 (internal quotation marks and citation omitted).

The Ordinance will fail this second test if it impermissibly delegates to police officers the authority to arrest and prosecute on "an ad hoc and subjective basis."  *Grayned*, 408 U.S. at 108; *see also Cox*, 379 U.S. at 555-58 (invalidating conviction for violating ordinance prohibiting the obstruction of public passages because of the law's routine, discriminatory enforcement).  A law is not vague simply because it requires law enforcement to exercise some degree of judgment. *See Grayned*, 408 U.S. at 114.  Instead, due process prohibits "sweeping standards that place unfettered discretion in the hands of police, judges, and juries to carry out arbitrary and erratic arrests and convictions."   *Wright v. New Jersey*, 469 U.S. 1146, 1151 (1985) (cleaned up) (quoting *Papachristou v. City of Jacksonville*, 405 U.S. 146, 162 (1972)).

An ordinance that grants police "the full discretion . . . to determine" whether a violation has occurred "entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat, . . . furnishes a convenient tool for harsh and discriminatory enforcement by prosecuting officials against particular groups deemed to merit their displeasure, . . . and confers on police a virtually unrestrained power to arrest and charge persons with a violation." *Kolender*, 461 U.S. at 357-58.  An ordinance invites arbitrary and discriminatory enforcement when "there are no standards governing the exercise of the discretion it grants."  *Papachristou*, 405 U.S. at 170. This includes ordinances whose application turns on subjective judgments or preferences either of  police officers or third parties.

The Court concludes the Ordinance facially encourages standardless decisionmaking and enforcement that is at odds with due process.  Empowering police officers to arrest and/or order dispersal when a single person at any time stands or positions herself in any public place in such a manner as to impede or interfere with the reasonable movement of vehicular or pedestrian traffic, construed and applied to authorize arrest when no such traffic is present, and with no *mens rea* requirement, is not immune from arbitrary application.

As previously discussed, the Ordinance contains no criteria or standards to inform a police officer when the authority to arrest for a violation thereunder is properly exercised. Unlike the statute in Agnew, the Ordinance does not limit arrest or dispersal authority to situations where *intentional* conduct that *actually* impedes or interferes with someone else's *use of* the public street, sidewalk, or other place is occurring or imminent.  The Ordinance does not require a police officer to have a reasonable belief that an arrest or dispersal order is necessary to carry out the Ordinance's goals to ensure public health, safety, and traffic regulation.  Without any standards to tailor the Ordinance's application to conduct that realistically presents public health, safety, or traffic concerns, the Ordinance "allows an unrestricted delegation of power

40

which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory, and overzealous enforcement." *Bell*, 697 F.3d at 463 (internal punctuation and quoted cases omitted).

As in *Coates v. City of Cincinnati,* the Ordinance encompasses "conduct clearly within the city's constitutional power to prohibit." 402 U.S. 611, 614 (1971). "The city is free to prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in countless other forms of antisocial conduct. It can do so through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited." *Id.* (citing *Gregory v. Chicago,* 394 U.S. 111, 118, 124-25 (Black, J., concurring)). It cannot constitutionally do so through the enactment and enforcement of an Ordinance lacking in minimal guidelines to govern law enforcement, whose violation may entirely depend upon a police officer's whim.

The Court concludes the Ordinance is also facially void for vagueness in violation of the Due Process Clause because it is susceptible to discriminatory or arbitrary enforcement.

## IV. Suitability of Injunctive Relief

In addition to seeking damages and a declaration that the Ordinance is unconstitutional, plaintiff seeks a permanent injunction barring its enforcement.

Courts must consider the following factors in determining whether to issue a permanent injunction: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties; (3) whether the movant proves actual success on the merits; and (4) the public interest." *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (quoting *Forest Park II v. Hadley*, 336 F.3d 724, 731 (8th Cir. 2003), and citing, among other cases, *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).

41

With respect to the first factor, "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Without a permanent injunction barring enforcement of the Ordinance, plaintiff's free speech rights and those of other citizens would continue to be infringed. Second, the issuance of an injunction would cause little or no harm to the City, because it can have no significant interest in the enforcement of a regulation that contravenes the United States Constitution. The City's interest in protecting public health, safety, and traffic regulation can be achieved through enactment and enforcement of an ordinance that comports with the Constitution. *Cf. Coates*, 402 U.S. at 614. Third, plaintiff has succeeded on her claim that the Ordinance is unconstitutional. Finally, the Eighth Circuit has made clear "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678, 691 (8th Cir. 2012) (en banc).

Therefore, the Court concludes it is appropriate to issue a permanent injunction barring enforcement or threatened enforcement of the Ordinance.

A.  Proper Scope of Injunctive Relief

The parties' summary judgment briefing does not address the proper scope of injunctive relief. The complaint challenges the constitutionality of Subsections (A), (B), (C), and (E) of the Ordinance, but excludes Subsection (D). The complaint asserts that the challenged subsections are unconstitutional because they do not include a *mens rea* requirement, confer virtually unrestrained authority on the police, and lend themselves to arbitrary, discriminatory, and harsh enforcement. (Doc. 1, ¶¶ 10-13, 15-16, 38-47, 52-58.) The prayer for relief seeks "a permanent injunction preventing enforcement of the Ordinance." (*Id.* at 9.)

42

The text of Subsections (B) and (C) prohibit persons from standing or otherwise positioning themselves in such a manner as to impede or interfere with vehicular or pedestrian traffic in "any entrance, exit, corridor or passage of any public building," and "at the entrance or exit to a private building, including driveway, entrance to a garage and entrance to a parking pad," respectively. *See* § I.C., *supra* at 6. Otherwise, the subsections share the same operative language as Subsection (A) that the Court has found unconstitutional. *Id*. Plaintiff is correct that Subsections (B) and (C) lack a *mens rea* requirement, confer virtually unrestrained authority on the police, and lend themselves to arbitrary and discriminatory enforcement.

Nonetheless, based on the summary judgment record, it does not appear to the Court that anything beyond enjoining the enforcement of Subsection (A) is presently at issue. It is true plaintiff's motion for partial summary judgment broadly seeks judgment that "[t]he ordinance at issue, St. Louis Code of Ordinances § 17.16.275, prohibiting the impedance of traffic with no exception for First Amendment activity under any circumstance (the Ordinance), is facially unconstitutional[.]" (Doc. 25 at 1.) Her memorandum in support, however, only quotes the text of Subsection (A), states it is the "portion most relevant here" (Doc. 32 at 5), and does not discuss Subsections (B) or (C) or cite any law relevant to those subsections. Nor does the City's summary judgment motion or memorandum in support specifically address Subsections (B) or (C). As a result, the Court concludes it has not been called upon to determine the constitutionality of Subsections (B) and (C) on summary judgment.[13]

The Court is mindful that injunctive relief should only be broad enough to remedy the underlying wrong. *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 790 (8th Cir. 2004). Here, plaintiff was arrested for violating Subsections (A) and (E) of the Ordinance. While much of the

---

[13]The Court recognizes that plaintiff filed a motion for *partial* summary judgment. It is unclear, however, whether plaintiff intends to waive her claims with respect to Ordinance Subsections (B) and (C) or assert them in some other manner.

43

precedent and principles applicable to free speech in traditional public forums such as streets and sidewalks analyzed above regarding Subsection (A) may apply similarly to public buildings, it is not clear from the existing record that they would apply coextensively to public buildings as a matter of law.  It is less clear that they would apply coextensively to the entrances and exits of private buildings.

The Court therefore finds it appropriate at this time to limit the scope of permanent injunctive relief to prohibit enforcement of Subsection (A) of the Ordinance.

B. Severability

A remaining question, separate from the proper scope of injunctive relief, is whether the entire Ordinance must be declared invalid or whether the unconstitutional provision may be severed.  Severability is a matter of state law.  *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). Under Missouri law, "When an ordinance's provision is found to be invalid, the Court will not declare the entire ordinance void unless it determines that the municipality would not have enacted the ordinance without the invalid portion." *City of St. Peters v. Roeder,* 466 S.W.3d 538, 547 & n.8 (Mo. 2015) (en banc) (applying statutory severability provision, § 1.140, Mo. Rev. Stat. (2000), to unconstitutional municipal ordinance).[14]

In the board bill enacting the Ordinance, the City's Board of Aldermen found that

> The residents of, visitors to, business owners of, and taxpayers
> within the City of St. Louis have an interest in protecting

---

[14]Section 1.140 of the Missouri Revised Statutes states:

> The provisions of every statute are severable.  If any provision of a statute is found . . . to be unconstitutional, the remaining provisions of the statute are valid unless the court finds the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions without the void one; or unless the court finds that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

themselves from the health and safety problems associated with having their reasonable movement as pedestrians or while in vehicles obstructed, impeded, interfered, hindered or delayed or being solicited for a ride, employment, business or contributions while in their vehicles.

St. Louis City Ordinance No. 69282, Section One.  (Doc. 23-5 at 1-2.)  The Ordinance also contains a severability clause that states:

The provisions of this section are severable.  If any provision of this ordinance is declared invalid, that invalidity shall not affect other provisions of the ordinance which can be given effect without the invalid provision.

*Id.*, Section Three, *Severability Clause*.  (Doc. 23-5 at 4.) [15]

Considering the Board of Aldermen's findings, the different places to which Subsections (B) and (C) apply, and the distinct types of conduct to which Subsection (D) applies, together with the inclusion of a severability clause, the Court cannot determine that the remaining subsections of the Ordinance are so essentially and inseparably connected with and dependent upon Subsection (A) that the Board of Aldermen would not have passed the Ordinance without Subsection (A), though it addresses an important aspect of the Ordinance's overall subject matter.  The Court therefore concludes the Ordinance is severable.

**V. Conclusion**

For the reasons discussed above, the Court concludes plaintiff is entitled to summary judgment on her First and Fourteenth Amendment facial and as-applied challenges to the Ordinance in Count I, and her Fourteenth Amendment due process claim in Count II because the Ordinance is void for vagueness.  Plaintiff has established that she is entitled to a declaratory judgment and a permanent injunction barring enforcement of Subsection (A) of Section

---

[15] Ordinance No. 69282 contains a sequential numbering error, as there are two sections designated as "Section Three" and two as "Section Four."  The severability clause is actually section five.

17.16.275 of the Revised Code of St. Louis.  This case remains set for a jury trial with respect to plaintiff's claim for damages against the City.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff Jessica Plaintiff's motion for summary judgment is **GRANTED**.  [Doc. 25]

**IT IS FURTHER ORDERED** that defendant City of St. Louis's motion for summary judgment is **DENIED**.  [Doc. 22]

A declaratory judgment and permanent injunction will accompany this Memorandum and Order.

Dated this 5th day of March, 2020.


_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE